IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 3:18-9 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| WILLIE GENE GULLEY, JR., | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>

Willie Gene Gulley, Jr. filed the instant Emergency Motion to Reconsider Detention (ECF No. 133) requesting his temporary release pursuant to 18 U.S.C. § 3142(i) due to his concerns about contracting COVID-19 while detained pending trial.  Gulley also argues that his pretrial confinement violates the Fifth Amendment's Due Process Clause and the Eighth Amendment's Cruel and Unusual Punishments Clause.  The Court held an evidentiary hearing and Gulley and the Government submitted post-hearing briefs.  For the following reasons, the Court **DENIES** Gulley's Motion.

I.      Background

Gulley is charged with two counts of distribution of less than one hundred grams of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (ECF No. 1)  The charges stem from two instances in which Gulley allegedly sold heroin to a confidential informant in March 2018.  At the time, Gulley was subject to two terms of supervised release imposed by this Court as a result of two prior federal felony drug trafficking convictions.  Gulley was arrested on March 21, 2018, and made his initial appearance the same day.  (ECF No. 7)  At his initial appearance, he was detained pending a

1

detention hearing.  (ECF No. 6)  After his initial appearance, but before a detention hearing was held, two no bond warrants were lodged as detainers based on the allegations in this case constituting violations of the terms of his supervised release.

Pretrial Services filed a report ("PTS Report") concluding that, because Gulley is "detained at two previous supervised release cases[,] . . . bond is moot at this time."  (PTS Report at 7)  At the hearing, Magistrate Judge Pesto ordered Gulley detained, stating that "defendant is held without prejudice to holding a hearing if there is a prospect of release.  At this point release is precluded by supervised release order[s]."  (ECF No. 31)

Gulley filed the instant Emergency Motion to Reconsider Detention on November 12, 2020, asking the Court to release him on bond due to the COVID-19 pandemic.  (ECF No. 133)  The Court held a hearing on the Motion by videoconference on December 17, 2020.  (ECF No.142)  Gulley filed a post-hearing brief on December 30, 2020.  (ECF No. 145)  The Government filed a post-hearing brief on January 7, 2021.  (ECF No. 146)  The motion is fully briefed and ripe for disposition (ECF Nos. 133, 142, 145, 146).

II.     **Legal Standard**

Under 18 U.S.C. § 3142, the Court may "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  The defendant has the burden to show that § 3142(i) permits his temporary release.  *United States v. Davis*, No. 2:20-CR-121-12, 2020 WL 4496581, at *2 (W.D. Pa. Aug. 4, 2020).  The defendant must demonstrate: (1) that his temporary release is necessary for the preparation of his defense or another compelling reason, and (2) that

2

he could be released to the custody of the United States marshal or another appropriate person. *Id.*

Under the "necessary for preparation of the person's defense" prong of § 3142(i), the defendant must demonstrate that temporary release is necessary, not just that "it would be helpful, preferable, or even ideal for a defendant's trial preparations." *United States v. Coggins*, No. 1:20-CR-00033, 2020 WL 2217259, at *6 (M.D. Pa. May 7, 2020) (quoting *United States v. Villegas*, No. 2:19-CR-568-AB, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020)). "If federal courts had to order temporary release just because it would aid a defendant's ability to work with counsel, the exception in section 3142(i) would swallow all detention orders." *Villegas*, 2020 WL 1649520, at *2. The defendant must show why less drastic measures such as a request to continue the trial date or alternative means of communication would be inadequate. *Villegas*, 2020 WL 1649520, at *2.

Courts have evaluated concerns regarding COVID-19 as potentially falling within the "another compelling reason" prong. *See United States v. Wilburn*, No. 2:18-CR-115, 2020 WL 1899146, at *4 (W.D. Pa. Apr. 17, 2020). In the related context of compassionate release, the Third Circuit has held that COVID-19 alone is insufficient to warrant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The same rationale applies to temporary release, and therefore, the defendant must "present an individualized argument as to why temporary release is necessary[;] [g]eneralized or speculative arguments are insufficient." *United States v. Watson*, No. 19-CR-203, 2020 WL 2309204, at *2 (W.D. Pa. May 8, 2020). "Temporary release may be most appropriate when the defendant suffers from a condition that makes him or her immunocompromised—something identified by public health officials as

3

making [a] person at 'high risk' for serious complications from COVID-19." *Id.* at \*3 (quoting *United States v. France*, No. 02:16-cr-196, ECF No. 325, p. 1-2 (W.D. Pa. May 5, 2020)). The defendant's "compelling reason" must be evaluated "in light of the 'backdrop of the Bail Reform Act as a whole.'" *Id.* (quoting *Wilburn*, 2020 WL 1899146, at \*4). Thus, the Court must "consider the [d]efendant's health as well as his dangerousness and risk of flight." *Watson*, 2020 WL 2309204, at \*3; *see Wilburn*, 2020 WL 1899146, at \*4.

In analyzing a request for temporary release based on COVID-19 concerns, courts have evaluated several factors: (1) the specificity of the defendant's stated COVID-19 concerns, (2) the original grounds for the defendant's pretrial detention, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. *United States v. Carter*, No. 18-cr-561-1, 2020 WL 3412571, at \*6 (E.D. Pa. June 22, 2020) (quoting *United States v. Deshields*, No. 190-cr-99, 2020 WL 2025377, at \*3 (M.D. Pa. Apr. 27, 2020)). These factors are not required to be weighed equally but are considered "as a whole to help guide the court's determination as to whether a 'compelling reason' exists such that temporary release is 'necessary.'" *United States v. Doe*, No. 18-cr-315-11, 2020 WL 5167553, at \*4 (E.D. Pa. Aug. 31, 2020) (quoting *United States v. Denmark*, No. 19-15, 2020 WL 1984306, at \*6 (M.D. Pa. Apr. 27, 2020)).

### III.   Discussion

#### A.  The Parties' Arguments

Gulley makes four arguments in favor of his release. First, he argues that his temporary release is necessary in light of COVID-19, his health conditions, and the insufficiency of the measures instituted by the Cambria County Prison to control the spread of COVID-19. Second,

4

he argues that his continued detention in light of COVID-19 constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Third, he argues that he has been denied substantive due process because the Government, through the prison's policies, has acted with deliberate indifference with regard to the risk of COVID-19 being transmitted to individuals in the Cambria County Prison.  Fourth, he argues that his right to counsel was interfered with because attorney in-person visits were suspended for two months at the Cambria County Prison due to COVID-19.

The Government argues that Gulley has not met his burden to show that temporary release is necessary.  (ECF No. 146 at 5–6)  The Government contends that Gulley's access to counsel has not been impeded:  he has been working with his attorney for two years, phone communications were never suspended or restricted, and Gulley has refused telephone calls and in-person visits from his attorney on multiple occasions since the COVID-19 pandemic began. (*Id.* at 6)

### B. Gulley has not Shown a Compelling Reason Necessitating Temporary Release in Light of the Backdrop of the Bail Reform Act as a Whole

#### 1. The Specificity of Gulley's COVID-19 Concerns

Gulley contends that he suffers from Type 2 diabetes, high blood pressure, sleep apnea, and severe obesity.  (ECF No. 133 at 4)  The Government concedes that Gulley suffers from obesity, Type 2 Diabetes, and hypertension.  (ECF No. 146 at 7)  An individual with severe obesity or Type 2 diabetes is "at an increased risk for severe illness from the virus that causes COVID-19."  Centers for Disease Control and Prevention ("CDC"), People with Certain Medical Conditions,        https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-

5

higher-risk.html (last visited Feb. 18, 2021) ("CDC COVID-19 Medical Conditions").    An individual with high blood pressure "might be at an increased risk for severe illness from the virus that causes COVID-19." *Id.*  The CDC does not include sleep apnea on the list of conditions that place, or might place, an individual at an increased risk for severe illness from the virus that causes COVID-19.  *See id.*  Therefore, the Court finds that Gulley suffers from conditions that place him at an increased risk for severe illness from the virus that causes COVID-19.

After Gulley filed the instant motion, he tested positive for COVID-19.  After a person recovers from COVID-19, the risk of re-infection is low.  The CDC has stated that, although cases of reinfection with COVID-19 have been reported, such cases of reinfection are "rare."  CDC, Reinfection    with    COVID-19,    https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last visited, Feb. 18, 2021).   In the compassionate release context, "a number of courts have found that an inmate recovering from the Covid-19 virus weigh[s] against release based on the risk of contracting the virus."  *United States v. Warner*, No. 1:13-CR-00782, 2021 WL 71588, at *3 (D.N.J. Jan. 8, 2021) (collecting cases).  Accordingly, Gulley's concerns about contracting COVID-19 are serious in light of his medical conditions, but such concerns would be greatly diminished after recovery due to the low risk of reinfection and would not be a significant factor in favor of his release.

### 2.    Original Grounds for Gulley's Pretrial Detention

The original grounds for Gulley's pretrial detention weigh strongly in favor of pretrial detention.  In evaluating this factor, the Court will use the 18 U.S.C. § 3142(g) factors as a guide.

### a. Framework of §3142 Detention

In cases where the maximum term of imprisonment exceeds ten years and involves a violation of the Controlled Substances Act, there is a rebuttable presumption that the defendant is to be detained pending trial. 18 U.S.C. § 3142(e)(3)(A). To succeed in rebutting this presumption, a defendant must "produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). In determining whether the defendant has rebutted the presumption of detention, the Court must consider the following factors: (1) the "nature and circumstances of the offense," including crimes involving violence or controlled substances; (2) the weight of the evidence; (3) the defendant's history and characteristics, including ties to the community, substance abuse, physical and mental health, record of appearing at court proceedings, and whether the alleged offense occurred while on probation or parole, among others; and (4) the "nature and seriousness of the danger to any person or the community" posed by release. 18 U.S.C. § 3142(g).

If the defendant rebuts the presumption of detention, the government must then show that there is no condition or combination of conditions that will reasonably assure either the defendant's appearance or the safety of the community. *Id.* §§ 3142(e), 3142(f). The government must prove that detention is necessary to ensure public safety by clear and convincing evidence, and risk of flight by a preponderance of the evidence. *Id.* § 3142(f)(2); *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The same factors that guide the Court in determining whether the defendant has rebutted the presumption of detention guide the Court's analysis in determining

whether the government has met its own burden. *United States v. Gidney*, No. 3:20-cr-7-12, 2020 WL 4340307, at *3 (W.D. Pa. July 28, 2020).

> **b.  The § 3142 Presumption of Detention has not Been Rebutted and no Condition or Combination of Conditions Would Reasonably Assure the Safety of the Community if Gulley were Released**

Gulley's charges carry a maximum term of imprisonment exceeding ten years and involve a violation of the Controlled Substances Act, so the rebuttable presumption that he be detained pending trial applies.

The Court holds that, based on the evidence before it, Gulley did not rebut § 3142's presumption of detention. The first factor—the nature and circumstance of the charged offense—favors detention. Gulley is charged with two counts of distribution of heroin, offenses which Congress recognized the seriousness of by creating a rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). Gulley has failed to produce credible evidence to contradict the seriousness of the offense, or the risk to the community that the offense poses.

The second factor—the weight of the evidence against Gulley—also favors detention. After receiving information that Gulley was involved in drug activity, law enforcement officers involved in the Southwest Pennsylvania Safe Streets Task Force conducted two controlled buys of heroin from Gulley utilizing a confidential informant. (ECF No. 84 at 18:13–19:13) The heroin that was allegedly purchased from Gulley is in the possession of the Government. (*Id.* 84 at 30:12-17) Thus, there is strong evidence that Gulley distributed heroin on two occasions.

The third factor—the nature and characteristics of the defendant—strongly favors detention.[1] Gulley's criminal history is extensive.  In 1989, Gulley pled guilty to robbery in the first degree in New York and was sentenced to three to nine years' imprisonment.  (PTS Report at 1)  In 1995, he pled guilty to criminal possession of a weapon in New York and was sentenced to five to fifteen years of incarceration.  (*Id.* at 1–2)  He was paroled on the possession of a weapon on April 5, 2002, but his parole revoked on January 30, 2003.  (*Id.*)  Next, on April 29, 2004, Gulley pled *nolo contendere* to Pennsylvania state charges for possessing a controlled substance and was sentenced to probation.  (*Id.* at 2)

In 2005, Gulley was indicted in the Western District of Pennsylvania on five counts: (1) conspiracy to distribute and possess with intent to distribute more than fifty but less than one hundred grams of cocaine base; (2) distribution of less than five grams of cocaine base; (3) possession with intent to distribute less than five grams of cocaine base; (4) possession of a firearm by a convicted felon; and (5) possession of ammunition by a convicted felon.  (*United States v. Gulley*, 3:05-cr-16, ECF Nos. 7, 65 (W.D. Pa. Nov. 15, 2005)).  Gulley pled guilty to Count One and acknowledged responsibility for the conduct in the other four counts.  (*Id.* at ECF Nos. 119, 120)  The Court sentenced Gulley to 151 months' imprisonment, to be followed by supervised release for five years.  (*Id.* at ECF No. 159)  Gulley's sentence was subsequently reduced to 120 months of imprisonment to be followed by 5 years of supervised release.  (*Id.* at ECF Nos. 202, 203)  Gulley was released to his term of supervised release on May 17, 2013.  (PTS Report at 4)

---

[1] The "Assessment of Nonappearance" portion of the PTS Report set forth the following reasons that the Defendant poses a risk of nonappearance: (1) offense charged; (2) criminal activity while under supervision; (3) pretrial, probation, parole, or supervised release status and compliance; and (4) criminal history.  (PTS Report at 6)

On April 22, 2015, Gulley pled guilty to an Information that, on or about August 18, 2014, he distributed less than twenty-eight grams of a mixture and substance containing a detectable amount of cocaine base. (*United States v. Gulley*, 3:15-cr-13, ECF Nos. 1, 8 (W.D. Pa. Apr. 22, 2015)) This offense occurred while Gulley was on supervised release for his 2005 case and the Court also issued a no bond warrant in that case to be lodged as a detainer because the conduct underlying the offense was also a violation of his supervised release. (*Gulley*, 3:05-cr-16, ECF No. 211)   The Court sentenced Gulley to 36 months of imprisonment to be followed by three years of supervised release. (*Gulley*, 3:15-cr-13, ECF No. 19) After he pled guilty, the Government moved to withdraw the Supervised Release Violation Petition in his 2005 case and the Court granted the motion. (*Gulley*, 3:05-cr-16, ECF No. 227)

On March 8, 2018, a criminal complaint was filed in state court against Gulley charging him with terroristic threats with intent to terrorize another and harassment for sending threatening text messages to one of his girlfriend's female friends indicating that anyone who associates with his girlfriend is going to have their "head blown off." (PTS Report at 6; *Gulley*, 3:15-cr-13, ECF No. 28 at 2) These charges were withdrawn on April 24, 2018. (PTS Report at 6)

When Gulley allegedly distributed heroin to a confidential informant in March 2018, he was under a term of supervised release for both his 2005 case and his 2015 case. (*Gulley*, 3:15-cr-13, ECF No. 28; *Gulley*, 3:05-cr-16, ECF No. 238).   After he was arrested in this case, the Court issued two warrants lodged as detainers without bond for alleged violations of supervised release.. (*Gulley*, 3:15-cr-13, ECF No. 28; *Gulley*, 3:05-cr-16, ECF No. 238).   Therefore, the nature and characteristics of the defendant strongly favors detention.

Finally, the fourth factor—the nature of the seriousness and danger to the community—favors detention.[2] This factor requires the Court to "assess the totality of the evidence presented." *United States v. Santiago-Pagan*, No. 1:08-cr-424, 2009 WL 1106814, at \*7 (M.D. Pa. Apr. 23, 2009). Looking at the totality of the evidence before it, the Court finds that Gulley presents a danger to the community if the Court does not order him detained pending trial.  Gulley allegedly sold heroin to a confidential informant on multiple occasions.  At the time, he was on supervised release.  His previous offense was also for distributing drugs and it occurred while Gulley was on supervised release.  Further, it appears that he was on a state term of supervised release during the time period that he participated in the conspiracy constituting his 2005 federal case.  (PTS Report at 4)  Gulley has a history of mixing drugs and guns which constitutes "a very serious danger to the community."  *United States v. Kulikowski*, No. CRIM.A. 15-19, 2015 WL 1445042, at \*8 (W.D. Pa. Mar. 30, 2015) (citing *United States v. Pitts*, Crim. No. 09–204, 2010 WL 3303800, at \*4–5 (W.D. Pa. Aug. 19, 2010)).  He has multiple felony convictions, including two prior federal convictions for drug trafficking.  Drug trafficking represents a danger to the community.  *See United States v. Strong*, 775 F.2d 504, 507 (3d Cir. 1985) (stating that "Congress intended to equate drug trafficking with danger to the community").  The danger to the community is the likelihood that the defendant will traffic in drugs if released.  *Kulikowski*, 2015 WL 1445042, at \*8 (citing *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986)).  Further, Gulley was not distributing small

---

[2] The "Assessment of Danger" portion of the PTS Report set forth the following reasons that the Defendant poses a risk of danger: (1) nature of the instant offense; (2) pretrial, probation, parole, or supervised release status and compliance; (3) criminal activity while under supervision; (4) criminal association; (5) gang involvement; (6) history/charge involving violence; (7) history of weapon use; (8) pattern of similar criminal activity history; (9) safety concerns for the community; and (10) criminal history.  (PTS Report at 7)

quantities of heroin but 50 bags of heroin in a single transaction. Therefore, no condition or combination of conditions of release could reasonably assure public safety if Gulley were released. Accordingly, the Court finds that Gulley poses a significant danger to the community if he is not detained pending trial.

Further, for the reasons discussed above, the Court finds that even if Gulley has rebutted the presumption of detention, the Government has proven by clear and convincing evidence that no condition or combination of conditions of release could reasonably assure public safety.

As noted above, Gulley is charged with two counts of distribution of heroin, which are serious offenses and pose a danger to the community. The weight of the evidence is strong and favors detention. Gulley's background and prior criminal history suggest a substantial likelihood of him committing further drug offenses if released. Finally, based on all these findings, there is a substantial risk to the safety of the public if Gulley is released.

The Court finds that the suggested conditions of release are inadequate to reasonably assure community safety because Gulley may become involved with the distribution of narcotics if released. Accordingly, the Court holds that the Government has presented clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of the public were it to release Gulley pending trial. Thus, a review of the original grounds for Gulley's pretrial detention utilizing the § 3142(g) factors strongly favors pretrial detention.

### 3. Extent to Which Gulley's Proposed Release Plan is Tailored to Mitigate or Exacerbate COVID-19 Risks to Himself

The third factor is the extent to which Gulley's proposed release plan is tailored to mitigate or exacerbate the risk of COVID-19 to himself. In considering this factor, the Court evaluates his

proposed release plan and compares it with the detention facility's plan to mitigate the risks of COVID-19.  In making this comparison, the Court focuses on whether the proposed release plan is anticipated to better mitigate the risks of COVID-19 to Gulley.

Gulley's release plan is to reside with his cousin in Johnstown, Pennsylvania.  (ECF No. 144 at 40:3–19, 57:11–24)  Gulley would have his own room in his cousin's house and Gulley and his cousin would be able to social distance from one another.  (*Id.* at 60:10–12)  Gulley's cousin takes care of his two daughters on weekends, but they would have their own bedroom in the residence and would be able to social distance.  (*Id.* at 62:10–63:7)  Gulley's cousin, and several other family members, are willing to act as a third-party custodian for him.  (*Id.* at 61:3–12, 65:21–24, 72:15–17)

The Court accepts that, as presented, Gulley's release plan is tailored to mitigate the risks of COVID-19 to himself and others.  However, the Court is skeptical of whether Gulley would abide by the release plan.  He has demonstrated that his compliance with recommended COVID-19 safety protocols is lax.  (ECF No. 144 at 21:2–15, 46:24–49:7)  He has also demonstrated a willingness to violate court-imposed restrictions on his release.  (PTS Report at 3–6; *Gulley*, 3:15-cr-13, ECF No. 28; *Gulley*, 3:05-cr-16, ECF No. 238)  Given Gulley's admitted non-compliance with social distancing and demonstrated willingness to violate court-imposed restrictions, the Court does not find that the proposed release plan would mitigate the risk of COVID-19 to him.  The plan would hinge on Gulley's voluntary and strict compliance with social distancing and other guidance, which he has demonstrated through his past actions that he is unlikely to do.  Further, a person who has recovered from COVID-19 is unlikely to become reinfected, which both undermines the reason for his temporary release and undermines the likelihood that Gulley

would abide by the release plan.  Therefore, the Court finds that this factor weighs against temporary release.

### 4. Likelihood that Gulley's Proposed Release Would Increase COVID-19 Risks to Others

The fourth factor is the likelihood that Gulley's proposed release would increase COVID-19 risks to others in the community.  It is difficult to address this factor under the present circumstances.  On one hand, Gulley has demonstrated that he is occasionally lax in following the recommended COVID-19 safety protocols.  (ECF No. 144 at 46:24–49:7)  There is no reason to believe that this laxness would not continue if he were released, and thus increase the risk of others contracting COVID-19.  On the other hand, since Gulley has contracted COVID-19, after a recovery the risk of re-infection is low.  *See Warner*, 2021 WL 71588, at *3.  Thus, after recovery, the risk of transmitting the virus to others would be low, but the justification for his temporary release would similarly be low.  Under either formulation, this factor does not weigh in favor of temporary release.

### 5. After Considering the Factors, Gulley has not Shown a Compelling Reason Necessitating his Temporary Release

The defendant's "compelling reason" must be evaluated "in light of the 'backdrop of the Bail Reform Act as a whole.'"  *Id.* (quoting *Wilburn*, 2020 WL 1899146, at *4).  After considering the relevant factors, the Court is unable to identify a basis to conclude that there are conditions, or a combination of conditions, that would protect others and the community from the risk of serious harm were Gulley to be released, even giving added weight and significance of Gulley's concerns regarding COVID-19.  The Court would reach this conclusion regardless of whether Gulley had become infected with COVID-19 after filing his motion.  Thus, considering

14

Defendant's request for temporary release in the context of the Bail Reform Act as a whole, the Court finds no compelling reason warranting such release under § 3142(i).[3]  *Davis*, 2020 WL 4496581, at *3.

### C. Gulley has not Shown that his Temporary Release is Necessary for the Preparation of his Defense

Gulley contends that he was denied the ability to prepare a defense for two months when the prison prohibited in-person visits from his attorney.  (ECF No. 145 at 15)  It is not entirely clear what remedy he seeks for this alleged violation of his right to counsel since any alleged violation has already been remedied.  (ECF No. 144 at 94:9–18, 95:8–96:8, 110:12–24, 111:22–112:17)  Because this issue is being raised in his motion regarding his release from detention, the Court interprets his argument as a motion for temporary release under the "necessary for preparation of the person's defense" prong of 18 U.S.C. § 3142(i).

The Court denies the motion for temporary release because it is not necessary for the preparation of his defense.  Gulley has been detained in this case for nearly two years and only alleges a two-month period in which he was unable to meet with his attorney in-person.  Gulley has refused telephonic and in-person meetings with his attorney since the COVID-19 pandemic began.[4]  Gulley has not shown that less dramatic measures, such as alternative means of communication or a continuance, were inadequate to his needs.  *Villegas*, 2020 WL 1649520, at *2

---

[3]  Even if the Court were inclined to grant Gulley temporary release in this case, he would still have two warrants lodged as detainers without bond for alleged violations of his supervised release in his 2005 and 2015 cases.  Thus, to effectuate Gulley's temporary release, the Court would also be required to modify those warrants.  In such circumstances, the Court would decline to modify either warrant.

[4]  Gulley refused a telephone call from his attorney on May 14, 2020, and refused to meet with his attorney on June 11, 2020, and August 13, 2020, when she traveled to the Cambria County Prison to meet with him. (ECF No. 122 at 2)

(stating that the defendant must show "why less drastic measures—such as requests to continue the trial date (consistent with the Speedy Trial Act) or alternative means of communication (including in writing or by available remote conferences)—would be inadequate for their specific needs"). He does not state why an in-person meeting was necessary during those two months. Assuming that there was a two-month period in which in-person visits were not permitted, the prohibition is not ongoing so his release at this point would not be necessary for the preparation of his defense. Finally, the Court has been under administrative orders since March 13, 2020, prohibiting criminal jury trials, which was recently extended from February 8, 2021 to May 3, 2021. (Administrative Order Concerning Jury Trials and Certain Other Proceedings Relative to COVID-19 Matters (No. 2:20-mc-394, ECF No. 19, updated as of February 2, 2021)) It is hard to see how two months of in-person visits being prohibited harmed Gulley in light of the administrative orders prohibiting jury trials and jury trials being delayed for nearly three more months. Accordingly, the Court denies Gulley's motion for temporary release under the "necessary for preparation of the person's defense" prong of 18 U.S.C. § 3142(i).

### D. The Eighth Amendment Cruel and Unusual Punishments Clause is Inapplicable

Gulley argues that it is "cruel and unusual punishment to subject him to health risks by incarceration that present a clear and present danger of serious illness or death." (ECF Nos. 133 at 5, 145 at 13) However, the Eighth Amendment's Cruel and Unusual Punishments Clause "does not apply until 'after sentence and conviction.'" *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). This is because the Eighth Amendment "was designed to protect those convicted of crimes and consequently the Clause applies only

after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (citation and internal quotations omitted). Therefore, the Eighth Amendment's Cruel and Unusual Punishments Clause is inapplicable to Gulley since he has not been convicted or sentenced.

> **E.  The Measures Taken to Mitigate Against the Spread of COVID-19 in the Cambria County Prison do not Violate the Fifth Amendment Due Process Clause**

Gulley also contends that he has been denied substantive due process because "the Government through the prison's policies and its enforcement act with deliberate indifference to the high infection rates of the Coronavirus, even while asymptomatic, and the high risk of death or serious bodily injury to inmates in high risk categories." (ECF No. 145 at 14)

"Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause." *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) (citation omitted). The protections provided to pretrial detainees by the Due Process Clause are "at least as great as the Eighth Amendment protections available to convicted prisoners." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983); *see Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018). The Due Process clause requires the government to provide appropriate medical care. *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987). However, "the existence of COVID-19 does not transform [a defendant's] pretrial detention into punishment prior to an adjudication of guilty." *United States v. Sterling*, 459 F. Supp. 3d 673, 680 (E.D. Pa. 2020).

In evaluating whether a condition of pretrial detainment violates the Fifth Amendment, the question is whether the condition amounts to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "The touchstone for the constitutionality of detention is whether conditions of

confinement are meant to punish or are 'but an incident of some other legitimate governmental purpose.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (quoting *Hubbard*, 538 F.3d at 232).  "The ultimate question is whether conditions are reasonably related to a legitimate governmental objective." *Hope*, 972 F.3d at 326 (internal quotations and citation omitted).  "[I]f a restriction is not related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Wolfish*, 414 U.S. at 539.

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 540 n.23 (citations omitted); *Hubbard*, 538 F.3d at 232 (same).  The Third Circuit instructs that it is important for courts to take into account the "legitimate objectives and difficulties of managing a detention facility" in assessing whether conditions of confinement are meant to punish.  *Hope*, 972 F.3d at 326.  "[C]ourts must acknowledge that practical considerations of detention justify limitations on many privileges and rights." *Id.* (internal quotations and citation omitted).  For a denial of medical care claim to constitute a due process violation, the defendant must demonstrate a serious medical need and acts or omissions that indicate deliberate indifference to that need.  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

The Cambria County Prison has taken significant steps to mitigate against the spread of COVID-19 within the facility.  At the beginning of the pandemic, the prison developed a plan which includes following CDC guidelines, Pennsylvania Department of Corrections guidelines,

and any other governmental guidelines.  (*Id.* at 86:22–87:1, 88:6–8)  The Cambria County Prison

has instituted cleaning procedures in accordance with CDC guidelines and state guidance.  (*Id.* at

87:11–19)  The prison has provided personal protective equipment, including masks, to staff and

inmates.  (*Id.* at 87:19–22)  The quarantine time for new inmates has been extended from 72 hours

to 14 days.  (*Id.* at 87:22–25)   New inmates are tested multiple times for COVID-19 while in

quarantine.  (*Id.* at 7:20–23)  Since the beginning of the pandemic, the prison has mandated that

prisoners and staff wear masks, social distance, and that high touch surfaces be regularly cleaned.

(*Id.*at 7:10–23)  The prison's COVID-19 guidelines are posted throughout the facility and in every

unit.[5]  (*Id.*at 12:16–19; Def. Ex. 1)  The prison has on-site medical care.  (ECF No. 144 at 86:16–19)

---

[5] The guidance from the prison reads:

> Since the Coronavirus Pandemic began, Cambria County prison has enacted numerous practices in order to help stop the spread of the virus, however there is no guarantee that it can be completely halted.  Everyone must do their part to try to keep the virus from spreading, some of the practices in place may seem extreme, but they are necessary.  The following are practices which will affect the inmate population, your cooperation is appreciated.

> - All social visitation is suspended and video visitation is encouraged.  Your attorney is permitted to visit as long as they pass the screening procedure and wear a protective mask.
> - Group activities, meetings and programming are suspended, including religious.
> - Masks have been issued and must be worn any time you are out of your cell; a mask should be laundered daily in the prison laundry.
> - Social distancing must be practiced in the day room area.
> - Proper handwashing and daily hygiene is a must.
> - Cleaning of high-touch surfaces is important, do not touch items as telephones, tablets, handrails, appliances, etc. until they are cleaned.
> - If you have any symptoms such as cough, headache, fever, loss of taste/smell notify the unit officer and/or medical department immediately so they can treat you.  You will not be charged copayment for this treatment.  Medical may test you for Covid-19 depending on your symptoms, if you are positive you will be treated appropriately.
> - The medical department will conduct preventative measures periodically; you will be asked to cooperate with periodic temperature checks.
> - Dealing with the Covid-19 pandemic is exhausting and very inconvenient, normal operations will be reinstituted as soon as it is safe to do so.  If you experience any concerns about your mental health, reach out to the medical department.

(Def. Ex. 1)

The prison's medical staff monitor inmates who are considered at high risk if they were to become infected with COVID-19.  (*Id.* at 89:8–13)  Inmates who exhibit symptoms of COVID-19 are quarantined and given a COVID-19 test.  (*Id.* at 89:16–25)  There is a dedicated unit for housing inmates who test positive for COVID-19.  (*Id.* at 89:19–20)

Despite these measures, the Cambria County Prison had an outbreak of COVID-19 in September and October 2020 in which approximately 183 inmates and staff tested positive for COVID-19.  (*Id.* at 91:10–25)  During this outbreak, the prison instituted additional lockdown measures to limit the movement of individuals within the facility and transferred around 90 inmates to other facilities to allow more room for inmates to socially distance and to be able to quarantine inmates who had tested positive.  (*Id.* at 92:12–23)

Gulley contends that the Cambria County Prison's COVID-19 protocols are deficient in several ways.  (ECF No. 145 at 6)  First, he contends that, although there is a policy on social distancing, there is insufficient room within the facility to actually socially distance from other inmates and that inmates disregard the social distancing guidelines.  (*Id.* at 6–7) Second, he argues that the prison's COVID-19 testing protocols are insufficient for several reasons:  (a) after reporting symptoms, inmates are still able to interact with other inmates; (b) there can be a delay of up to two days between an inmate reporting symptoms and being seen by medical staff; (c) new inmates are not quarantined prior to being tested for COVID-19 and are only quarantined and removed from being in contact with other inmates after they test positive for COVID-19; and (d) the testing protocols for staff are insufficient because staff are not tested on a routine basis but are only tested if they disclose symptoms.  (*Id.* at 7–8)  Third, Gulley contends that the masks inmates are given are insufficient because each inmate is only given two cloth masks with t-shirt

style material which they are required to wash.  (*Id.* at 9; ECF No. 144 at 12:20–13:12)  Fourth, Gulley contends that the prison's disinfection policies are insufficient because inmates are given an insufficient amount of soap for washing their hands, are not given any soap for cleaning their masks, surfaces are not wiped down with sufficient frequency, and cleaning materials for inmates to use on high-touch surfaces like phones are located in an inconvenient location so many inmates do not use them despite the policy requiring them to do so.  (*Id.* at 9)

Several of the issues raised by Gulley were contradicted by Cambria County Prison Deputy Warden Craig Descavish.  Deputy Warden Descavish testified that the quarantine time for new inmates has been extended from 72 hours to 14 days and that new inmates are tested for COVID-19 on day two and day twelve of their quarantine.  (*Id.* at 87:22–25, 88:9–17)  He stated that the masks provided to the inmates were purchased through, and approved by, the Pennsylvania Department of Corrections and are a "cloth-style mask, pretty similar to what most of us wear out in the public."  (*Id.* at 88:21–89:2)  He further stated that antibacterial soap was provided to inmates on an as-needed basis.  (*Id.* at 89:3–7)  In addition, he testified that the prison has instituted cleaning procedures in accordance with CDC guidelines and the Pennsylvania Emergency Management Agency guidelines, which includes wiping of high touch areas, and that "anything that's used by staff or the inmates is cleaned several times daily or after use."  (*Id.* at 87:11–15)  Deputy Warden Descavish also testified that there are "dedicated cleaning crews in our common areas of the prison that do nothing but wipe and clean those kind of areas, all three shifts throughout the day, so it's done 24 hours a day."  (*Id.* at 87:15–18)

The prison's COVID-19 guidance, which is posted in every unit, addresses several of Gulley's other concerns.  It provides that masks "should be laundered daily in the prison

laundry." (Def. Ex. 1) It further provides that "social distancing must be practiced in the day room area," that "[p]roper handwashing and daily hygiene is a must," and that high touch areas should not be touched until after they are cleaned. (*Id.*)

Gulley himself does not comply with all the prison's guidelines. He is one of the inmates who does not observe the social distancing guidelines, as demonstrated by his statement that he plays cards with groups of other inmates without social distancing. (*Id.* at 21:2–15, 47:2–19) In addition, Gulley has a voluntary job in the prison and his job routinely puts him into close contact with other inmates in the prison. (*Id.* at 48:13–23) Notably, Gulley has been housed in the quarantine unit for new inmates because of his job in the prison and, before that unit was designated as the quarantine unit for new inmates, Gulley was given the option to move to a different unit and he declined. (*Id.* at 93:9–22, 108:3–14)

The restrictions imposed on inmates at the Cambria County Prison to prevent the spread of COVID-19 are clearly related to a legitimate governmental objective. There is no evidence the facility has exaggerated its response to the pandemic or formulated and imposed any COVID-19-based restriction arbitrarily or for the purpose of punishing pretrial detainees. *See Wolfish*, 441 U.S. at 548 ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Block v. Rutherford*, 468 U.S. 576,585 (1984) (same); *Rinaldi v. United States*, 904 F.3d 257, 273–74 (3d Cir. 2018) (same). There is no evidence of an intent to punish or arbitrary conduct. Nothing in Gulley's presentation supports an inference that prison officials are imposing conditions or failing to impose conditions on Gulley as a punitive measure. Gulley has not shown that the facility and authorities are unable

22

or unwilling to address COVID-19.  Further, Gulley has not shown acts or omissions that indicate a deliberate indifference to a serious medical need.  There is no indication that Gulley has received inadequate medical care, as Gulley testified that he sees a nurse twice a day and always receives his medication.  (*Id.* at 44:4–13)  Accordingly, the Court finds that Gulley has not shown that the conditions of his confinement have violated his right to due process under the Fifth Amendment.

### V. Conclusion

After carefully considering the circumstances of this case, the Court finds that Gulley has not shown that his temporary release is necessary.  Further, the Court finds that Gulley's pretrial detention does not violate the Fifth or Eighth Amendments of the Constitution.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 3:18-9 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| WILLIE GENE GULLEY, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

NOW, this 19th day of February, 2021, upon consideration of Defendant Willie Gene

Gulley, Jr.'s Emergency Motion to Reconsider Detention (ECF No. 133), and for the reasons set

forth in the accompanying Memorandum Opinion, the Court **HEREBY FINDS** that Defendant

has failed to demonstrate that his temporary release is necessary and has not demonstrated a

violation of his rights under the Fifth or Eighth Amendments of the Constitution.  Accordingly,

Defendant's Emergency Motion to Reconsider Detention (ECF No. 133) is **DENIED.**


BY THE COURT


_____
KIM R. GIBSON
UNITED STATES DISTRICT JUDGE